In re the MARRIAGE OF M____ A____ R.K____ and L____ J.K____.

M____ A____ R.K____, Respondent,

v.

L____ J.K____, Appellant.

No. 14222.

Missouri Court of Appeals,
Southern District,
Division Two.

June 11, 1986.

Charles H. Staples, Freeman, Whitfield, Montgomery, Staples & White, St. Louis, for appellant.

James E. Baldwin, Donnelly, Baldwin & Wilhite, Lebanon, for respondent.

CROW, Judge.

L—— J.K—— ("the father") appeals from a decree entered March 8, 1985, dissolving his marriage to M—— A—— R.K—— ("the mother"). Four of the five points relied on by the father pertain to the denial of his request for visitation rights with the parties' two children, sole custody of whom was awarded to the mother. The father's other point attacks the award of "indefinite maintenance" to the mother.

The gloomy saga chronicled in the transcript began when the parties were married in 1971. Their first child, a boy, was born January 28, 1974; their other child, also a boy, was born November 1, 1975. The parties' marriage was dissolved in December, 1980, custody of both sons being awarded to the mother.

On June 14, 1982, the mother and the father married each other again, and lived together until separating January 26, 1984. The mother had custody of the sons from the date of that separation until entry of the dissolution decree, March 8, 1985.

Pertinent to the father's first four points, the decree contains the following findings:

"From the evidence received court finds that the wishes of the children (both of them) were that custody be with the mother and the children did not want to be with the father any for fear of being beat. The mother indicated that she wanted custody of the children. The father was more concerned with visitation with the children than custody. Dr. W——, a psychologist called by [the mother], testified that in his professional opinion the boys should have absolutely no visitation with the father under any circumstances. In his opinion, the boys would experience stress beyond their capacities and would be at psychological risk if visitation were allowed. The chil-

dren did well in school and were active in church. The two boys were extremely close. The boys appeared to be in good health the day of trial although there was substantial evidence of beatings, shovings and kickings by [the father] to the children. There was evidence the children had been bruised by [the father]. Further [the father] called them names and used profanity to them. Court finds that it is in the best interests of the children that custody of the children be awarded to [the mother]. Further Court finds that it is in the best interest of the children, that no visitation be allowed to the father. This court is aware that it is important that both parents have a continuing relationship with the children. However, in this instance, the physical and mental well being of the children dictates no visitation be allowed by the father. The Court has explored the possibility of a supervised structured visitation and determined that again, in the best interest of the children, visitation not be allowed even under these circumstances."

The trial that produced those findings took place March 1, 1985. After all of the witnesses had testified, the trial court, per § 452.385, RSMo 1978, interviewed both children, together, in the presence of counsel (but not the parties), and caused a record of the interview to be made. On June 28, 1985, after the transcript had been prepared, the deputy circuit clerk notified counsel for both parties by letter that the trial court had entered the following order:

"Court directs the clerk to remove the pages of transcript from the attorneys copies which pertain to the interview of the children in chambers as the court ordered tha [sic] portion of the record closed. The clerk shall retain those copies in her office sealed so that the public does not have access to those proceedings. The interview in chambers tran-scripted [sic] shall remain in the original transcript but the court orders that the attorneys shall not copy any part of the interview w/the children from the original not [sic] shall they allow anyone other than an associate, partner, etc. working in their law firm to have access to the original transcript before forwarding it back to the court."

■ The father's third assignment of error—the first one we consider—asserts that the trial court's refusal to allow the father's counsel to question the children during the interview in chambers was an abuse of discretion, and plain error. The father tells us, in his brief, that a reading of the transcript of the interview will reveal that his counsel[1] made an effort to question the children, but was denied that opportunity by the court. In saying that, the father flagrantly and inexcusably misstates the record.

We have carefully searched the portion of the transcript where the interview appears (pages 398–425), and have found absolutely no request by the father's attorney to question the children, nor have we located any objection by the father's attorney to the manner in which the trial court conducted the interview.

The father's brief laments that inasmuch as he was denied that portion of the transcript containing the interview, he cannot quote the segment relevant to his third point. The statement is preposterous. The father's attorney, on July 22, 1985, more than three weeks after entry of the order about which he complains, signed a certificate approving the original transcript (filed with us), which transcript contains the record of the interview. Obviously, the father's attorney had access to the record of the interview long before he filed his brief,[2] and could have easily noted the page or pages pertinent to his third point.

1. The attorney now representing the father is not the attorney who represented the father at trial.

2. The father's present attorney received the transcript July 1, 1985. Said attorney tendered a brief for filing on October 21, 1985. Because of certain deficiencies, immaterial here, the brief was rejected, and the father's attorney filed a corrected brief on November 18, 1985.

The point is destitute of merit.

■ The father's fourth point postulates that the trial court erred in ordering that the record of the interview with the children appear only in the transcript filed with us. The father alleges that this "was an abuse of discretion, without legal authority, and deprived [the father] of competently formulating his appellate argument, and was plain error." The father cites no authority in support of this hypothesis.

We need not, in this appeal, explore the authority of a trial court to order a portion of a transcript withheld from public access, or the authority of a trial court to order a segment of a transcript deleted from the copies furnished counsel. The reason this is unnecessary is that the father has demonstrated absolutely no prejudice from the order he attacks. Furthermore, during the pendency of this appeal, the father requested no relief from us regarding that order.

The trial court conducted the interview with the children in a fair, impartial, and non-suggestive manner. As more fully appears later, everything the trial court learned from the children was favorable to the mother and deleterious to the father. The father neglects to explain how the order of June 28, 1985, hindered him in "formulating his appellate argument," and no such handicap is apparent to us. The father's attorney was present throughout the interview; consequently, had there been anything favorable to the father, it could have been highlighted in his brief. Instead of attempting to fabricate error in the trial court's order, the father should be grateful that at least this segment of the record of his reprehensible behavior will remain sequestered from public view.

The point is meritless, and warrants no further comment.

We next address the father's first two points, which will be considered together. The first point states:

"The denial of supervised child visitation by the court was an abuse of discretion based upon insufficient evidence that such visitation would be detrimental to the children, where the conclusion of an expert relied on by the court was based largely upon an evaluation of [the father] within four years prior to trial."

The second point states:

"The denial of supervised child visitation was an abuse of discretion and plain error, there being insufficient credible evidence as to the current psychological status of the children. Testimony of a psychologist who evaluated the children five months prior to trial was too remote in time to reveal current mental status."

As to the first point, Dr. W____, mentioned in the trial court's findings, testified that he saw the father, the mother, and both children in "the fall of 1980," prior to the first dissolution. Dr. W____'s opinion of the father at that time was that he "should seek counseling to learn to control his behavior and that visitation with the children should take place under supervision." At the trial of the instant case, when the father's attorney reminded Dr. W____ that his examination of the father had occurred some four and a half years earlier, Dr. W____ explained: "[A] personality doesn't change. ... His behavior might change but the structure of what made him like he is comes out of all the fabric of all his experiences from birth on."

Asked whether the father would be able to modify his behavior without professional assistance so as to enable him to establish a meaningful and worthwhile relationship with his sons, Dr. W____ replied, "I feel he cannot do that."

Regarding the father's second point, Dr. W____ recounted that after seeing the two sons in 1980, he interviewed them again in September, 1984, and gave them "projective tests." Based on the tests and interviews, Dr. W____ testified: "... I found psychopathology in the older boy.... I found a neurosis, an anxiety neurosis. And I find considerable conflict in the younger boy but it wasn't at a stage of neurosis."

Asked what effect it would have on the boys if they had any association with the father, Dr. W____ testified: "... The older

boy's anxiety and neurosis would be worsened. It is worsened by thinking of his father. Just the idea of his father, particularly his father's treatment of his mother and the boys. And that's a kind of a fragile adjustment problem. Right now his stress and anxiety is at a point that goes beyond his personality's ability to adjust and handle it. And further stimulus, in this case the father, would run the risk of causing his adjustment to break and cause him to be psychologically inefficient or mentally ill, to put it another way.... [T]he younger boy ... is at a point where I feel that he also would be put at psychological risk of developing what is an adjustment problem now into a more clear cut neurotic situation. One of the characteristics, one of the findings, is that these boys are now getting at an age where they hold themselves responsible for not being able to protect their mother and that's terribly frustrating for them. So anything that reminds them of their own failure in that regard, again puts on more pressure in what are pretty fragile psychological adjustments at this time, according to my data and my opinion."

At trial, the father voiced no objection that Dr. W____'s evaluations of the children were too remote in time to reveal their current mental status.

No mention has yet been made of the mother's testimony regarding her treatment by the father. The mother's testimony, corroborated by photographs of facial bruises and by the revelations of the children during the court's interview, established a grim record of physical violence, mental abuse, humiliation, and degradation meted out by the father. Illustrative of the father's character is the fact that, by his own admission, he established a system of "bird whistles" to summon the mother or the sons to the bathroom when he was taking hour-long bubble baths. The purpose, as explained by the father, was to instruct whomever was summoned to bring him tea or other items. The father assigned a specific bird call to each family member.

The mother's testimony is best characterized by the following melancholy excerpt: "We were in a prison. We were literally living in a prison."

The law applicable to the denial of visitation rights to a noncustodial parent is codified in § 452.400.1, RSMo Cum.Supp. 1984:

"A parent not granted custody of the child is entitled to reasonable visitation rights unless the court finds, after a hearing, that visitation would endanger the child's physical health or impair his emotional development."

In considering the father's contention that the evidence was insufficient to support such a finding, we bear in mind that we must accept as true the evidence and permissible inferences favorable to the judgment, and disregard the contradictory evidence, *Morgan v. Morgan*, 701 S.W.2d 177, 179[3] (Mo.App.1985); *In re the Marriage of Scobee*, 667 S.W.2d 467, 468[3] (Mo.App.1984), and that where there are conflicts in the evidence, the trial court has the prerogative to determine the credibility of the witnesses, accepting or rejecting all, part or none of the testimony. *Morgan*, 701 S.W.2d at 179[2]; *Ware v. Ware*, 647 S.W.2d 582, 583–84[2] (Mo.App.1983).

■ So viewed, the evidence is more than ample to support a finding that visitation by the father would endanger each child's physical health and impair his emotional development. The mother's testimony was replete with instances of physical abuse of the children by the father, which terrified them, degrading verbal attacks on the children by the father, and threats by the father of future violence, including a warning "that when they were 18 or older he'd still be able to beat the hell out of them." The mother's testimony, coupled with the expressions of fear by the children that they would be physically harmed by the father during visitation—the mother not being there to protect them—would have been sufficient to support the denial of visitation, even without the testimony of Dr. W____.

**450**

The weight to be accorded Dr. W____'s testimony was for the trial court, not us, to determine. Whether Dr. W____ correctly evaluated the father in 1980, and whether that evaluation was still valid at time of trial, were questions for the trial court's resolution.

It is important to remember, however, that the pivotal issue before the trial court was not the present condition of the father, but was instead how contact with the father, even under supervision, would affect the children. Dr. W____ concluded, five months before trial, that any contact with the father would further damage the already fragile psychological health of the children. The father presented no expert testimony to the contrary.

The father's argument that Dr. W____'s evaluation of the children five months before trial was too remote to establish their "mental status" at time of trial is unsupported by any citation of authority, and is particularly unpersuasive in view of the fact that during the court's interview, the children expressed the same attitude toward their father that Dr. W____ had described.

The father's glib attempt to explain away the damning evidence against him was obviously rejected as unconvincing by the trial court, who, as noted above, was free to disbelieve the father or any other witness.

The father's contention that the evidence was insufficient to support the trial court's denial of supervised visitation is untenable. Indeed, given the evidence that the trial court obviously believed, it would have been a grievous abuse of discretion to allow the father any contact with the children.

The father's first and second points are denied.

■ The father's final point, which avers that the award of "indefinite maintenance"[3] to the mother was unsupported by substantial evidence, is as devoid of merit

as his earlier points. We have carefully studied all 427 pages of the transcript, and find that the maintenance award is supported by substantial evidence and is not against the weight of the evidence, that no error of law appears in regard thereto, and that an extended discussion of the maintenance issue would have no precedential value. Accordingly, the maintenance award is upheld per Rule 84.16(b), Missouri Rules of Civil Procedure (17th ed. 1986).

Judgment affirmed.

PREWITT, C.J., HOGAN, P.J., and MAUS, J., concur.

---

**3.** By "indefinite maintenance," the father refers to an award of $250 per month with no speci-    fied termination date.